[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 5, 2011
JOHN LEY
CLERK

_____

No. 10-11076

_____

D.C. Docket No. 7:08-cr-00245-LSC-PWG-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

LARRY P. LANGFORD,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(August 5, 2011)

Before MARCUS and ANDERSON, Circuit Judges, and MILLS,[*] District Judge.

MARCUS, Circuit Judge:

---

[*] Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

In this political corruption case, Larry P. Langford, formerly a Commissioner for Jefferson County, Alabama and Mayor of Birmingham, Alabama, appeals following his convictions for multiple counts of bribery, conspiracy, money laundering, mail and wire fraud, tax fraud, and criminal forfeiture. Langford broadly argues that: (1) the evidence was insufficient to support his convictions for mail and wire fraud; (2) the district court fatally erred in some of its evidentiary rulings; (3) the district court wrongfully charged the jury about the bribery statute; and, finally, (4) the district court mistakenly denied his post-voir-dire motion for a change of venue. After thorough review, we affirm.

## I.

In November 2008, a federal grand jury sitting in the Northern District of Alabama returned a 101-count superseding indictment against Larry P. Langford, William B. Blount, and Albert W. LaPierre. Langford was charged in 61 of those counts, involving bribery, 18 U.S.C. § 666(a)(1)(B) (Counts 1, 7, and 10-36); conspiracy, 18 U.S.C. § 371 (Count 6); money laundering, 18 U.S.C. § 1957 (Counts 3, 4, 5, and 9); mail fraud, 18 U.S.C. §§ 1341, 1346, and 2 (Counts 64-68); wire fraud, 18 U.S.C. §§ 1343, 1346, and 2 (Counts 69-86); filing false personal income tax returns, 26 U.S.C. § 7206(1) (Counts 87-89); and criminal forfeiture (Count 99). The charges all arose out of the basic allegation that, while

2

Langford was serving as an elected member of the Jefferson County Commission, and as the President of that body, he received more than $240,000 in cash, clothing, and jewelry from Blount (often through an intermediary, LaPierre), in exchange for ensuring that Blount's investment firm was awarded a series of profitable contracts with Jefferson County. Blount pled guilty to conspiracy and bribery charges, and LaPierre pled guilty to conspiracy and tax fraud charges. They both became government witnesses. Langford, however, went to trial.

Before trial, Langford moved for a change of venue from the Southern Division of Alabama's Northern District, in Birmingham, to the Western Division of Alabama's Northern District, in Tuscaloosa. He based his request on "extensive" publicity, claiming that "[t]he primary print media in the Southern Division, the Birmingham News, has printed numerous articles about this case from well before the indictment to the present." Without objection from the government, the district court granted the motion and moved the trial, in accordance with Langford's request, to Tuscaloosa.

At the conclusion of extensive voir dire, Langford requested still another change of venue, arguing this time that based on the responses of the venire panel, a small number of whom admitted to hearing about the case before trial, he wanted to move the trial to "some place where they haven't heard about this at all." The

3

district court denied the motion, and Langford proceeded to trial in Tuscaloosa. Thereafter, he was convicted on all counts.

The essential facts adduced at trial were these. Larry Langford took office as a County Commissioner for Jefferson County, Alabama in the fall of 2002. Soon thereafter, he was selected by his fellow commissioners as President of the Commission and, in that capacity, served as head of the Finance Committee. He remained in that role until he was elected Mayor of Birmingham in the fall of 2007.

William Blount had at one time been the Chairman of the Alabama Democratic Party, and had known Langford for twenty-five to thirty years, since Langford was first elected to the City Council in the City of Birmingham. Blount assisted in Langford's campaign for election as a County Commissioner. Blount also was a partner in Blount-Parrish & Company ("Blount-Parrish"), an investment banking firm that specialized in the underwriting and marketing of municipal bonds. An underwriter buys bonds from the municipality and then sells them to the market.

Blount-Parrish did some work for Jefferson County prior to 1998, but did not participate in any Jefferson County bond offerings from about 1998 to 2002. However, soon after Langford took office as a County Commissioner, a meeting

4

was held in January, 2003 between Langford, Blount, Norm Davis (an individual Langford identified as the County's financial advisor), and Steve Sayler (Director of Finance for Jefferson County before and during Langford's term as President of the County Commission). According to Sayler, the defendant Langford introduced Davis and Blount as "the two individuals that he would be taking a lot of advice from for financial transactions at the County."

The policy in Jefferson County was that County Commissioners could pick the firms to participate in the County's financial transactions. Blount sought out Jefferson County work for his investment banking firm, Blount-Parrish, from Langford. Langford, in turn, selected Blount-Parrish to participate in many of the County's financial transactions. In fact, during Langford's term as President of the County Commission (2002-2007), Blount-Parrish: (1) underwrote a series of bonds issued by the Jefferson County Commission, some of which were general obligation and some sewer revenue;[1] (2) worked on interest rate swap deals; (3) worked on privatizing landfills owned by the County; (4) worked on remarketing several weekly rate reset bonds for the County; (5) assisted with the financing for

---

[1] "General obligation" bonds require that all of the County's revenues and resources are obligated to pay back the debt, while "sewer revenue" bonds require only that revenue of the sewer system is obligated to pay back the debt.

5

passing a sales tax for the County; and (6) worked on the attempted acquisition of other sewer systems.

Thus, for example, on January 28, 2003, the Commission had scheduled on its agenda the need to establish a "financing team" for the issuance of "general obligation warrants of the County."[2] Blount-Parrish was designated the "senior underwriter" of the deal, receiving 45 percent of "the underwriting liability." In March, the deal (a $94 million transaction) was officially approved by the Commission. For its part, Blount-Parrish received $282,000 in fees.

Blount-Parrish was included in the County's next major financial transaction, a $1.17 billion sewer rate interest swap and bond refinancing that closed on May 1, 2003. Blount solicited County Commissioner Langford to keep Blount-Parrish as the remarketing agent in these transactions; soon thereafter Langford and other Jefferson County Commissioners voted, on April 22, 2003, to approve a resolution authorizing these bonds. Blount-Parrish was included in at least five other Jefferson County interest rate swap transactions in 2003 and 2004.[3] For these transactions, Blount-Parrish received fees of $2,600,000, $225,000, $728,500, $842,000, and $842,000, respectively. All told, Blount-Parrish was

---

[2] A "warrant" is another name for a debt obligation, like a bond.

[3] Blount-Parrish participated in Jefferson County interest rate swap transactions in July 2003 and in November 2003, and in three swap transactions in June 2004.

paid some $7 million in fees related to transactions involving Jefferson County, which, according to Langford's Presentence Investigation Report ("PSI"), yielded a "net benefit" to Blount-Parrish of about $5.5 million.

Blount-Parrish's fees for these transactions with the County were disclosed some of the time only to Commissioner Langford. For example, on March 27, 2003, the Commission approved "the issue of about one billion dollars worth of sewer revenue refunding warrants to pay off old sewer debt." An agreement between JPMorgan Chase Bank and the County regarding the deal is dated March 28, 2003. It was signed by Langford on behalf of the County and purported to list the "fees" paid to various entities as a result of the transaction. Notably, Blount-Parrish was not listed as one of those entities. Instead, a separate letter was sent to Langford alone disclosing that Goldman Sachs -- another participant in the transaction -- "intends to pay [an unspecified amount of] consulting fees in connection with [the] swap to Blount Parrish." This method of "disclosure" -- whereby fees Blount-Parrish received from the County were "disclosed" in a separate letter addressed solely to Commissioner Langford, referred to as a "side letter" -- was the favored method of doing business for many of the deals. Indeed in one deal that generated $2,600,000 for Blount-Parrish, the firm's fees were "disclosed" only in a "side letter."

On still another occasion in 2003, James Lister of Lehman Brothers talked with Blount to discuss potential business with the County. Blount told Lister he had "a very good relationship with [Commissioner Langford] and . . . something to the effect . . . that he had or controlled three votes on the commission." When the issue of fee disclosure came up later, however, Lister explained his firm's policy that any fees paid to a third-party "had to be disclosed in the documentation." Blount said "he had to check with [Commissioner Langford] to find out whether that policy would be acceptable." Blount subsequently inquired whether "what he described as a side letter, something that would not be actually in the documentation but would be signed by [Commissioner Langford] acknowledging the fee, whether that would be satisfactory." After Lister said no, he had no further communication with Blount.

During Langford's term as President of the Jefferson County Commission, William Blount gave Langford approximately $150,000 in cash and more than $90,000 worth of clothing and jewelry. As for the jewelry and clothing, Blount would purchase items for Langford that caught the Commissioner's eye while he was shopping. Among other things, Blount bought Langford a $1,600 suit from Oxxford Clothing store in New York on July 25, 2003; over $14,800 worth of jewelry from Bromberg's jewelry store on October 1, 2003 and December 29,

8

2004; a $1,110 sweater from Turnbull and Asser in New York on December 10, 2003; a nearly $12,000 watch from Tourneau in New York on November 9, 2004; and nearly $8,000 worth of clothing in New York from Ermenegildo Zegna on April 14, 2004, Ferragamo on July 11, 2004 and November 7, 2004, and Century 21 on July 13, 2004. Whenever Langford wanted an item while shopping with Blount, he would pick it out and place it on the table, whereupon Blount would buy it for him. Blount made some of these purchases when he and Langford were traveling in New York for Langford to meet with bankers, lawyers, and other public financial professionals involved in county bond business. The items were then shipped from the New York stores to Langford's Jefferson County office.[4]

---

[4] As part of the mail fraud counts, Count 64 involved the shipment from New York of the $1,110 sweater from Turnbull and Asser in December 2003; Count 65 involved the shipment from New York of $3,290 in clothing from Zegna in April 2004; Count 66 involved the shipment from New York of $2,796 in clothing from Ferragamo in July 2004; Count 67 involved the shipment from New York of $1,854.96 in clothing from Century 21 in July 2004; and Count 68 involved the shipment from New York of the approximately $12,000 watch from Tourneau in November 2004. As part of the wire fraud counts, Counts 69-86 related to the payments Blount or LaPierre made with an American Express credit card on Langford's behalf at Remon's Clothiers or Bromberg's jewelry store in Birmingham on April 29, 2004 in the amount of $2,133; on May 26, 2004 in the amount of $2,707.56; on September 8, 2004 in the amount of $4,050; on October 13, 2004 in the amount of $4,250; on November 19, 2004 in the amount of $1,662.60; on December 29, 2004 in the amount of $11,750.40; on June 30, 2005 in the amount of $3,547; on October 5, 2005 in the amount of $2,000; on October 6, 2005 in the amount of $5,000; on October 26, 2005 in the amount of $ 2,500; on December 21, 2005 in the amounts of $1,800 and $2,300; on March 8, 2006 in the amount of $1,876; on May 25, 2006 in the amount of $1,000; on June 20, 2006 in the amount of $1,047.96; on September 13, 2006 in the amount of $1,500; on December 8, 2006 in the amount of $1,000; and on May 17, 2007 in the amount of $7,536.

The cash transfers were typically made through an intermediary, Al LaPierre. LaPierre was a long-time associate of both Langford's and Blount's, had been the executive director of the Alabama Democratic Party, and was working at all relevant times as a lobbyist in Jefferson County. In fact, Blount had hired LaPierre to be Blount's "eyes and ears" in Jefferson County. Whenever Langford needed money, he would alert LaPierre, who would, in turn, tell Blount. Thus, for example, in 2002, Al LaPierre informed Blount that Langford was "in very dire need of money to pay off some clothing bills," and that Langford had asked LaPierre to arrange a loan for him. Langford had made a number of unsuccessful efforts to obtain a loan on his own. Blount and Langford also discussed the issue directly. Blount then "talked to Caryn Cope, a friend of [his], who was the Chief Credit Officer at Colonial Bank at the time, and asked if they would be willing to consider making the loan to Commissioner Langford." Despite Langford's "lower credit score," Cope approved the loan because "Bill Blount made [her] feel comfortable" about it. It was a six-month loan for $50,000.

In early 2003, after Langford's Colonial Bank loan came due, Commissioner Langford went to LaPierre for more financial help because Langford was late on repaying the $50,000 Colonial Bank loan. LaPierre explained to Langford that he did not have "that type of money," but would make

10

a call. LaPierre in turn called Blount, who arranged for LaPierre to take out a loan for $50,000 from Colonial Bank in LaPierre's name in order to pay off the initial $50,000 loan Langford had taken from Colonial Bank. Blount then sent LaPierre a check for $50,000, which LaPierre used to pay off his loan. When Blount was asked why he did not pay off Langford's loan himself, Blount testified, "I knew I could not do it because I was either going to be doing work for Jefferson County or perhaps already had."

In another instance, in June 2003, County Commissioner Langford went to LaPierre seeking still more financial help to pay off $69,000 in accumulated debt -- which Langford owed for dental work, as well as for other bills. LaPierre promptly called Blount and, shortly thereafter, Blount sent LaPierre a check for $69,000; LaPierre turned around and wrote Langford a check for the same amount. Even though LaPierre did not expect the money ever to be repaid, he wrote the word "loan" on the memo line of the check. In August 2004, Blount wrote yet another check to LaPierre for $30,000 to help Langford with an "income tax problem that had to be paid." Blount wrote on the check that this too was for loan proceeds, even though it was not a loan. On August 12, 2004, LaPierre in turn wrote a check to Langford in the amount of $30,000. LaPierre falsely identified the transfer as a "loan" on the check itself.

11

In connection with these so-called "loans," Blount asked a lawyer he knew to draft promissory notes that LaPierre had Langford sign. Three notes were made to appear as if there were in fact three "loans" that LaPierre had extended to Langford.[5] The notes were prepared, according to Blount, "because we didn't want to -- we did not want it to appear as though money was being given directly from Mr. LaPierre to [Commissioner] Langford." Just like the testimony offered by LaPierre, Blount testified at trial that despite the written notes, these transactions were not really loans -- "they [were not] notes anybody expected to have paid back." There was no expectation that the Commissioner would ever repay them. Out of all the cash Langford received from Blount through LaPierre (a total of approximately $150,000, paid out between early 2003 and August 2004), Langford returned $5,000 in May 2008.

Blount unambiguously testified that he paid the cash and gave valuable clothing and jewelry to Langford as a series of bribes to a public official. Specifically, he said, he bribed Commissioner Langford "by providing funds to Al

_____

[5] According to Blount's testimony, the first note related to the $50,000 that LaPierre had paid to Langford for Langford to pay off his Colonial Bank loan; the second related to the $69,000 that LaPierre had paid to Langford for Langford to pay off dental and other bills; and the third related to the $30,000 that LaPierre had paid to Langford in order to help Langford pay his income taxes. While the original notes did not mention any property as collateral, the notes were later amended to reflect that Langford had an interest in property that was being pledged as collateral for the notes.

LaPierre, who gave them to [Commissioner] Langford, and by buying a number of gifts, jewelry, clothing for [Commissioner] Langford." As for why he did it, Blount bluntly explained that "I wanted to make absolutely certain that Blount-Parrish was involved in as many bond issues and swap and financial transactions in Jefferson County as I possibly could."

While both Blount and LaPierre testified that they had not specifically told Langford that Blount was the source of the loan money, they explained that they had not done so because he had not asked, and they both were convinced he knew. Indeed, Langford had directly discussed with Blount Langford's need for the initial Colonial Bank loan, and Blount assisted him in obtaining it. When Langford made a subsequent request for money, LaPierre said he did not have the money but would make a call. And Blount himself made many of Langford's clothing and jewelry purchases in Langford's presence. In addition, after Langford testified at a hearing conducted by the Securities & Exchange Commission ("SEC") on June 21, 2007, Langford, LaPierre, and Blount met to sign updated promissory notes purportedly representing the "loans" that had been extended by LaPierre to Langford. Both LaPierre and Blount testified that Langford was not at all surprised that Blount was there.

13

Following an eight-day trial, the jury convicted Langford on all counts. The district court, thereafter, sentenced Langford to serve a total term of 180 months of imprisonment, and a supervised release term of 36 months. Langford was also required to pay a special assessment of $6,000, make restitution to the IRS in the amount of $119,985, and criminally forfeit $241,843.65. This timely appeal followed.

## II.

We review the sufficiency of the evidence de novo, taking the evidence in the light most favorable to the government and drawing all reasonable inferences in favor of the jury's verdict. United States v. Klopf, 423 F.3d 1228, 1236 (11th Cir. 2005). We review the trial court's evidentiary rulings for clear abuse of discretion. United States v. Dodds, 347 F.3d 893, 897 (11th Cir. 2003). If, however, the objection raises the right to confront witnesses, we review it de novo. United States v. Yates, 438 F.3d 1307, 1311 (11th Cir. 2006). Finally, we "review a district court's denial of a Rule 21 motion for change of venue for an abuse of discretion." United States v. Campa, 459 F.3d 1121, 1143 (11th Cir. 2006) (en banc).

First, we are unpersuaded by Langford's claim that the evidence was insufficient to support his convictions for mail and wire fraud. At issue is whether

14

a reasonable fact-finder could have determined that the evidence proved the defendant's guilt beyond a reasonable doubt. United States v. Smith, 459 F.3d 1276, 1286 (11th Cir. 2006). In other words, we will not disturb the verdict unless no reasonable trier of fact could find guilt beyond a reasonable doubt. United States v. Lee, 603 F.3d 904, 912 (11th Cir.), cert. denied, 131 S. Ct. 437 (2010). Moreover, circumstantial evidence may be used to establish an element of a crime, even if the jury could draw more than one reasonable inference from the circumstantial evidence, and in judging sufficiency of the evidence, we apply the same standard whether the evidence is direct or circumstantial. United States v. Hersh, 297 F.3d 1233, 1254 n.31 (11th Cir. 2002).

As for the mail fraud counts, the government charged County Commissioner Langford with having caused the use of the mails on five occasions when packages containing merchandise purchased for him in New York by Blount were mailed to Langford's office in Alabama. The mailings were designed, among other things, to execute a scheme to defraud Jefferson County and its citizens of the right to Commissioner Langford's honest services. As for the wire fraud counts, the government similarly charged Langford with having caused the use of the wires when Blount or LaPierre used an American Express card to make purchases or to pay an account on Langford's behalf, again for the purpose of

15

executing a scheme to defraud Jefferson County and its citizens of the right to Commissioner Langford's honest services.

Langford claims that there was no evidence the defendant "obtained or schemed to obtain the alleged property by the use of false or fraudulent pretenses, representations or promises, an essential element under the mail and wire fraud statutes." Blue Br. at 32. Aside from the means by which the fraud has been executed, the elements of mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343, are the same. United States v. Ward, 486 F.3d 1212, 1221 (11th Cir. 2007). "Both offenses require that a person (1) intentionally participates in a scheme or artifice to defraud another of money or property, and (2) uses or 'causes' the use of the mails or wires for the purpose of executing the scheme or artifice." Id. at 1222.

The mail and wire fraud counts Langford challenges alleged not only traditional mail and wire fraud, but also "honest services" mail or wire fraud. To prove "honest services" mail or wire fraud, the government must prove beyond a reasonable doubt that the defendant intentionally participated in a scheme or artifice to deprive the persons to whom the defendant owed a fiduciary duty of the intangible right of honest services, and used the United States mails or wires to carry out that scheme or artifice. See 18 U.S.C. § 1346 (defining "scheme or

16

artifice to defraud" to include a "scheme or artifice to deprive another of the intangible right of honest services").[6] The term "honest services" is not defined in the statute, but we have found that when a public official "uses his office for

_____

[6] Specifically, the mail fraud section of the statute provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1341.

> Similarly, the wire fraud section provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343.

> The statute further provides:

> For the purposes of this chapter [relating to mail and wire fraud], the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

18 U.S.C. § 1346.

17

personal gain, he deprives his constituents of their right to have him perform his official duties in their best interest." United States v. Lopez-Lukis, 102 F.3d 1164, 1169 (11th Cir. 1997).

We have not expressly explored at length what manner of concealment, if any, is necessary to prove honest services mail or wire fraud. However, we have said that honest services fraud "may be proved through the defendant's non-action or non-disclosure of material facts intended to create a false and fraudulent representation." United States v. Waymer, 55 F.3d 564, 571 (11th Cir. 1995); see also United States v. Browne, 505 F.3d 1229, 1265 (11th Cir. 2007) ("[A] defendant's non-action or non-disclosure of material facts intended to create a false and fraudulent representation may constitute a violation of the mail fraud statute where the defendant had a duty, explicit or implicit, to disclose material information."). Not surprisingly, we have held that because "[e]lected officials generally owe a fiduciary duty to the electorate," when a public official "secretly makes his decision based on his own personal interests -- as when an official accepts a bribe or personally benefits from an undisclosed conflict of interest -- the official has defrauded the public of his honest services." Lopez-Lukis, 102 F.3d at 1169 (emphases added). As we explained in United States v. deVegter, 198 F.3d 1324, 1328 (11th Cir. 1999):

18

> Public officials inherently owe a fiduciary duty to the public to make governmental decisions in the public's best interest. . . . [I]n a democracy, citizens elect public officials to act for the common good. When official action is corrupted by secret bribes or kickbacks, the essence of the political contract is violated. Illicit personal gain by a government official deprives the public of its intangible right to the honest services of the official.

Id. (citations and quotations omitted).

In short, the "paradigm case of honest services fraud is the bribery of a public official." Id. at 1327-28. Thus, in order to prove that Langford defrauded the public of his honest services, the government had to prove beyond a reasonable doubt that Langford was in fact a public official and that he accepted bribes that he did not disclose to the public.[7] Indeed, in Lopez-Lukis, the indictment alleged that a lobbyist had paid a county commissioner in order to influence her actions as a county commissioner and that, in order to facilitate their scheme, the defendants concealed their "monetary and intimate relationship" from the public. 102 F.3d at 1166. The defendants conceded that the indictment was sufficient with respect to the allegation that the county commissioner had committed honest services fraud by selling her vote. We agreed, and went on to

---

[7] In his reply brief, Langford cites United States v. Maxwell, 579 F.3d 1282, 1299 (11th Cir. 2009), for the proposition that "[a] scheme to defraud requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property." However, Maxwell was not an honest services case; again, in honest services cases, the scheme to defraud the public of honest services can be proven when a public official accepts a bribe and fails to disclose it to the public.

19

hold further that on these facts, the county commissioner had also committed honest services fraud by taking steps to ensure that a majority of commissioners voted with her. Id. at 1169.[8]

As the trial record before us amply shows, the government established that Langford was President of the Jefferson County Commission, that he was conferred with public authority to choose, and did select Blount-Parrish to participate in and obtain payments amounting to millions of dollars in fees relating to Jefferson County financial transactions, including the issuance of bonds. In exchange, Langford received, among other things, thousands of dollars' worth of clothing and jewelry from Blount, a partner in Blount-Parrish, along with large cash payments in the form of bogus "loans." In receiving the valuable items, Langford caused the use of the mails and wires. What's more, Langford did not disclose that he had received these valuables from Blount either to the public, the

---

[8] We have affirmed honest services convictions in other cases involving similar types of conduct by public officials, and notably, where the concealment was generalized. See Waymer, 55 F.3d at 572 (affirming honest services mail fraud conviction where a defendant school board member failed to apprise the board that he was "receiving a direct and substantial cut from a vendor's contract with the school system in exchange for the performance of virtually no services"); United States v. Walker, 490 F.3d 1282, 1296-98 (11th Cir. 2007) (affirming honest services mail fraud conviction where a state legislator failed to properly disclose his financial dealings with a hospital in his annual financial disclosure statements); United States v. McNair, 605 F.3d 1152, 1200 (11th Cir. 2010) (affirming honest services mail fraud conviction where the director of a county's environmental services division took steps to conceal that he had received approximately $105,000 in landscaping and lawn maintenance from a contractor that the official had the power to favor in a sewer rehabilitation program).

20

IRS, or, as far as the record reveals, to anyone else. Langford also received letters from JPMorgan disclosing the fees paid to Blount-Parrish, but those fees were never disclosed in letters sent to the County generally.

Thus, beyond proving that Langford failed to disclose the receipt of these bribes to the public -- all that is required under Lopez-Lukis -- the evidence established that Langford engaged in a series of elaborate steps of concealment by failing to disclose these valuables as income to the IRS, and in failing to disclose the Blount-Parrish fees to the County. In short, there is more than enough evidence to have enabled the jury to find beyond a reasonable doubt that Langford engaged in concealment, that he did so to deprive the County of his honest services, and that the mails and wires were used to execute the scheme to defraud.[9]

---

[9] The Supreme Court has recently cut back on what constitutes honest services fraud in Skilling v. United States, 130 S. Ct. 2896 (2010), but Skilling does not affect our decision in any way. In Skilling, the Supreme Court considered the scope and constitutionality of the honest services statute, and determined that "[t]o preserve the statute without transgressing constitutional limitations," § 1346 criminalizes only "fraudulent schemes to deprive another of honest services through bribes or kickbacks." Id. at 2928-29, 2931. The Supreme Court rejected the government's argument that § 1346 should also encompass "undisclosed self-dealing by a public official or private employee -- i.e., the taking of official action by the employee [or official] that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty." Id. at 2932 (quotation omitted). Because the government in Skilling alleged that Skilling, an executive of a private corporation, engaged in self-dealing -- and did not allege that Skilling accepted bribes or kickbacks, nor that Skilling solicited or accepted side payments from a third party in exchange for making misrepresentations to his company's shareholders about the company's fiscal health -- the Supreme Court determined that Skilling's honest services fraud conviction was flawed and vacated the Fifth Circuit's affirmance of Skilling's conspiracy conviction. Id. at 2934-35. Here, however, in sharp contrast, there is no doubt that the government charged Langford with accepting bribes as a

Langford also claims that there was insufficient evidence to support his use of the mails for the five mail fraud counts, which were based on the shipment of valuables that Blount had purchased in New York and were mailed to Langford's office in Jefferson County, Alabama. As the record amply established, Blount and Langford had gone on numerous trips to New York for Langford to meet with bankers, lawyers, and other public financial professionals involved in county business. During those trips, Blount purchased for Langford items from five stores (Turnbull in December 2003, Zegna in April 2004, Ferragamo in July 2004, Century 21 in July 2004, and Tourneau in November 2004). These mailings formed the core of the five mail fraud counts.

Langford argues, nevertheless, that he did not "use the mails" because the items belonged to Langford at the time Blount purchased them, and therefore, the subsequent mailings were not done "in furtherance" of any scheme. This claim is without any merit. In a bribery scheme, receipt of a valuable which constitutes the bribe undeniably furthers the scheme, and the jury could have found on this ample record that Langford used the United States mails to receive the proceeds of the bribes. See Ward, 486 F.3d at 1222 ("[A] person causes the mails to be used within the meaning of 18 U.S.C. § 1341 . . . when he acts with knowledge that the

public official -- classic honest services fraud that existed before, and after, Skilling.

22

use of the mails . . . will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended.") (quotation omitted).

## III.

We are also unpersuaded by Langford's claim that the district court erred in making various evidentiary rulings at trial. Typically, "[a]ll relevant evidence is admissible" at trial. Fed. R. Evid. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Rule 403 of the Federal Rules of Evidence provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. Moreover, even if an evidentiary ruling is erroneous, "it will not result in a reversal of the conviction if the error was harmless." United States v. Docampo, 573 F.3d 1091, 1096 (11th Cir. 2009). "An error is harmless unless there is a reasonable likelihood that it affected the defendant's substantial rights." United States v. Hands, 184 F.3d 1322, 1329 (11th Cir. 1999) (quotation and brackets

23

omitted). "No reversal will result if sufficient evidence uninfected by any error supports the verdict, and the error did not have a substantial influence on the outcome of the case." United States v. Khanani, 502 F.3d 1281, 1292 (11th Cir. 2007) (quotation omitted).

## A. Tax Returns Listing Gambling Winnings

First, Langford argues that the district court abused its discretion in admitting his personal income tax returns, which listed "eye-catching" gambling winnings, in their entirety. Specifically, his tax return for 2003 listed gambling winnings of $28,040; his tax return for 2004 listed gambling winnings of $4,200; and his tax return for 2005 listed gambling winnings of $80,510. The tax returns also revealed that Langford did not report as income any of the cash, clothing or jewelry he received from Blount for the taxable years 2003, 2004, and 2005.

Indisputably, the returns were relevant, in fact they were essential to the tax-fraud charges. Each of those counts charged Langford with filing a false tax return based on his failure to report income -- the cash, clothing, and jewelry he received from Blount and LaPierre. The returns, signed by Langford under penalty of perjury, were the best evidence supporting those charges. Indeed, they were the very corpus delicti of the criminal tax charges: the grand jury alleged that he violated 26 U.S.C. § 7206(1) by filing false personal income tax returns in the

24

taxable years 2003, 2004, and 2005.  And, although Langford argues that he offered to stipulate "that the loans and gifts were not reported in the returns," Blue Br. at 23, the government was not obliged to accept the stipulation. See Old Chief v. United States, 519 U.S. 172, 186-87, 189 (1997) (recognizing that, outside the unique context of a prior conviction,"the accepted rule that the prosecution is entitled to prove its case free from any defendant's option to stipulate the evidence away rests on good sense" and "a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it").

Langford argues in the alternative that, even if the tax returns were properly admitted, the district court still abused its discretion in declining to redact the references to Langford's gambling income. The district court rejected the request because Langford's gambling was not illegal, from the voir dire examination it was evident that the vast majority of the jury pool had gambled before and did not oppose it, and striking the references to  gambling would have left the jury to speculate about what had been hidden from them.[10]  Indeed, Langford did not

_____

[10] In his reply brief, Langford claims that the district court made a legal error by refusing to exclude the gambling evidence on the ground that gambling is legal and therefore could not be prejudicial.  While Langford is right that the law does not require activity to be illegal for it to be prejudicial, the district court did not base its ruling on a misconception of the law.  That something is illegal may make it more prejudicial, but in any event, the district court found the gambling evidence non-prejudicial not simply because it was legal, but because this particular

25

engage in any illegal activity through his gambling, and what's more, dutifully reported his winnings to the IRS, affording the inference that he was a law-abiding citizen. While three members of the venire had heard in the news that Langford had allegedly benefitted from rigged gambling machines, the record is clear that the two who indicated that this might affect their judgment were removed from the jury pool. Langford's suggestion that evidence of his gambling winnings would somehow tell the jury that he was paid bribes in the form of rigged winnings or might have been received negatively by those jurors who were unlucky in casinos, amounts to rank speculation. No evidence from this record supports the claim. Moreover, redactions of the defendant's personal income tax returns well might have led the jurors to theorize that something far more prejudicial than evidence of gambling had been removed from Langford's tax returns. The district court acted well within its discretion in declining to redact the tax returns.

### B. Evidence of a Relationship Between Langford and Gambling-Establishment Owner Milton McGregor

Next, Langford claims that the district court erred by admitting evidence purportedly relating to a gambling-establishment owner, Milton McGregor. The defendant says that the government "worked hard" at "efforts to emphasize Milton

jury pool in voir dire had not evinced any prejudice about it. In short, the district court made no legal error in this ruling.

26

McGregor's position as a gambling magnate and his relationship to Mr. Langford." Blue Br. at 24. This characterization of the evidence is not supported by the record. McGregor's name came up in the context of two loans involving Langford. First, in the summer of 2002, Blount arranged for Langford to get a $50,000 loan at Colonial Bank through Caryn Cope, a Colonial Bank employee Blount was dating at the time. Langford got the loan, but, when it came due, he was unable to pay it off. So, to help Langford, Al LaPierre got a loan for the purpose of paying off Langford's loan. On his application for credit LaPierre listed Milton McGregor as a reference. In that context, a bank employee was asked at trial if she knew "who Milton McGregor is?" She responded: "He is the owner of one of the race horse places, I'm sorry, I can't think of the name of it." Langford's counsel did <u>not</u> object to this question or answer.

McGregor's name came up once more in the context of another loan Blount attempted to secure for Langford. In June 2003, Blount again called Caryn Cope "about a $75,000 loan request for Mr. Langford." Cope told Blount that her boss, Robert Lowder, would have to approve that request. According to Cope, "Bill Blount suggested that Milton McGregor, who knew all the parties involved, and my boss, Bobby Lo[w]der, that he could talk to him about it and make him comfortable with the [$]75,000 loan request." Cope described McGregor as a

27

board member of Colonial Bank, not as Langford claims, a "gambling magnate." The gist of the discussions, Cope said, concerned an attempt to get McGregor to "say hey, I will personally stand good on this loan, that it will personally be paid by Mr. Langford." Ultimately, however, the loan request was not approved.

On this record, we cannot say that the district court abused its discretion, much less committed plain error, in permitting this testimony relating to Milton McGregor.[11] The two discussions highlighted above -- which mentioned McGregor's name on five pages of a 1900-plus-paged transcript for an eight-day trial -- were the extent of the evidence relating to Milton McGregor. There is no support for the claim that the government made "efforts to emphasize Milton McGregor's position as a gambling magnate and his relationship to Mr. Langford." A single witness describing McGregor as "the owner of one of the race horse places" does not match that description. Moreover, we cannot deny

---

[11] For this evidentiary challenge, plain error review applies in part, since Langford's counsel did not specifically object to the testimony of the government's witness that McGregor owned a "race horse place[]." "To preserve an issue for appeal, a general objection or an objection on other grounds will not suffice." United States v. Gallo-Chamorro, 48 F.3d 502, 507 (11th Cir. 1995). By failing to object to the admission of evidence on a particular ground, a defendant "denies the trial court an opportunity to cure immediately any error created by the admission." United States v. Chilcote, 724 F.2d 1498, 1503 (11th Cir. 1984). If an error was not preserved, we do not apply the usual abuse of discretion standard of review but rather review for plain error. Id. Under the plain-error standard, we will not correct an error raised for the first time on appeal unless there is (1) error, (2) that is plain, (3) that affects substantial rights, and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. See United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005).

that because of Blount's efforts to utilize McGregor's position as a member of the board of Colonial Bank to secure a loan for the defendant, the testimony mentioning McGregor was plainly relevant.

### C. Records Relating to Langford's NBC Credit Card

Langford also complains that certain bank records related to his credit card at NBC Bank were improperly admitted. These records showed further special treatment that Langford received in exchange for county business. Specifically, Commissioner Langford caused the County to hire NBC Bank in February 2003 as its "financial advisor" for the bond transactions. Sometime later, Langford applied for a credit card from NBC Bank, and the bank issued one even though Langford's credit rating did not meet the bank's standards. Langford later applied for and was granted increases to his credit limit, even though his payment history was poor and the unpaid debt on the card was rising. The government argued that the records relating to the credit card were relevant under Federal Rule of Evidence 404(b) as evidence of "other . . . acts" probative of intent -- in that Langford solicited, and the bank gave him, the card and extensions of credit as bribes to keep the County's business.

Langford admits that the bank records were "possibly relevant," but argues that the records should have been excluded because they constituted inadmissible

29

hearsay. The district court admitted them under the business records exception to the hearsay rule set forth in Rule 803(6) of the Federal Rules of Evidence.

Under the business-records exception, the following documents are admissible:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, . . . unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

Fed. R. Evid. 803(6). Langford argues that the records were improperly admitted because the proffered custodial witness, NBC Bank employee Kelly O'Donnell, who served on NBC's Financial Advisory Team, did not have personal knowledge of each of the records and therefore was not qualified as a "custodian or other qualified witness" under the Rule.

We are unpersuaded. The advisory committee note to Rule 803(6), as clarified by the 1974 amendment, makes this point clear:

> It is the understanding of the committee that the use of the phrase "person with knowledge" is not intended to imply that the party seeking to introduce the memorandum, report, record, or data compilation must be able to produce, or even identify, the specific individual upon whose first-hand knowledge the memorandum, report, record or data

compilation was based. A sufficient foundation for the introduction of such evidence will be laid if the party seeking to introduce the evidence is able to show that it was the regular practice of the activity to base such memorandums, reports, records, or data compilations upon a transmission from a person with knowledge . . . .

Fed. R. Evid. 803 advisory committee's note. "To satisfy Rule 803(6), . . . the proponent must establish that it was the business practice of the recording entity to obtain such information from persons with personal knowledge and the business practice of the proponent to maintain the records produced by the recording entity." United States v. Bueno-Sierra, 99 F.3d 375, 379 (11th Cir. 1996).

Here, the government laid the following foundation:

[AUSA]: Ms. O'Donnell, did the bank designate you as the custodian of records for these documents that are in front of you?

A: Yes.

[AUSA]: And to be clear, you don't have personal knowledge of the content of those documents?

A: Correct.

[AUSA]: But do you have personal knowledge of the process that was involved with gathering those documents?

A: Yes.

[AUSA]: And were these documents gathered from businesses at the bank, ongoing businesses?

A: They were.

[AUSA]: And these are documents that were made at or around the time, they were not made in response to a grand jury subpoena, the documents were not created in response to a grand jury subpoena?

A: No. They were part of or appear to be part of documents routinely held in the normal course of business.

We have said that "[t]he touchstone of admissibility under the business records exception to the hearsay rule is reliability, and a trial judge has broad discretion to determine the admissibility of such evidence." Bueno-Sierra, 99 F.3d at 378. So, in United States v. Atchley, 699 F.2d 1055, 1058 (11th Cir. 1983), we found that a proper foundation for a business record had been laid where "Ms. McCook identified each exhibit and testified under oath that these records were kept in the ordinary course of business, that it was the ordinary course of her business to make and keep such records, that the records were made on or about the time of the transactions reflected in the records, and that she was the custodian of those records." We explained: "It is not essential that the offering witness be the recorder or even be certain of who recorded the item. It is sufficient that the witness be able to identify the record as authentic and specify that it was made and preserved in the regular course of business." Id. (quotation omitted).

Similar testimony was elicited here -- O'Donnell testified that she was the custodian of the records, that she had personal knowledge of the process involved

32

in gathering the documents, that the documents had been gathered from ongoing businesses at the bank, that the documents were not made in response to a subpoena, and that the documents were part of, or appeared to be part of, documents routinely held in the normal course of business. Moreover, defense counsel admitted that they did not challenge the authenticity of the documents. The district court did not abuse its discretion in admitting this evidence as a business record.[12]

### D. A Loan Officer's Testimony About a $50,000 Loan to Langford

Langford also claims that the district court erred in allowing a bank employee to testify that when she evaluated a loan application made by the defendant she learned that Langford was already a customer of the bank, albeit at a branch thirteen miles away from the employee's branch. The defendant says that this was hearsay, and that it was prejudicial because somehow it suggested that Langford was trying to hide his activity from those with whom he normally did business.

---

[12] Langford also makes a passing reference to a Confrontation Clause violation, based on the introduction of these business records, but business records are not considered testimonial -- a necessary element of a Confrontation Clause violation. See United States v. Naranjo, 634 F.3d 1198, 1213-14 (11th Cir. 2011) (holding that the Confrontation Clause does not apply to business records because they are not testimonial and the Confrontation Clause only provides a right to cross-examination of testimonial statements) (citing Crawford v. Washington, 541 U.S. 36, 56 (2004) (discussing "statements that by their nature were not testimonial -- for example, business records")).

The challenged testimony was elicited in connection with the $50,000 loan for Langford that Blount helped to arrange through his girlfriend and Colonial Bank employee, Caryn Cope. Cope -- who headed Colonial Bank's credit department for the State of Alabama -- contacted Yvette Campbell, the Roebuck Branch Manager of Colonial Bank, to tell her that the $50,000 loan for Langford had been approved. According to Campbell, "when we do the loan, we have to pull up to see if the customer already has a profile on file," i.e., to determine if the loan applicant is already a customer of Colonial Bank. Campbell testified that she discovered Langford was a bank customer at the Shades Valley Location, which, Campbell explained was thirteen miles away from her branch.

The government does not claim that Campbell's testimony -- based on her review of business records not introduced into evidence -- was not hearsay. However, it argues, and we agree, that Langford's assertion of prejudice is belied by the testimony of the other bank employee, Caryn Cope. Specifically, Cope testified that typically she was not involved in these kinds of loans, but she approved this one "because Bill Blount had called me and asked me about it." She did so despite the fact that Langford had a "lower credit score." She further testified that she had decided to call Campbell and send Langford to Roebuck because Cope "had worked with [Campbell] for a long time." Thus, the jury

34

learned from Cope that Langford had gone to the Roebuck branch not because he wanted to conceal his activities, but because Cope had sent him there based on her personal relationship with the manager of the Roebuck branch. We can discern no way that Campbell's testimony affected Langford's substantial rights, and thus conclude that the admission of this testimony, even if it was hearsay, caused the defendant no prejudice. Hands, 184 F.3d at 1329.

We add that the evidence of Langford's guilt in accepting many bribes -- including testimony by Blount, corroborated by extensive documentation, that he paid Langford $240,000 in cash, clothing and jewelry so that Blount's investment-banking firm would receive millions of dollars' worth of fees from financial transactions in Jefferson County -- was overwhelming. Thus, even if the challenged evidence taken in concert -- about Langford's gambling winnings, his purported relationship with McGregor, special treatment in receiving an NBC credit card (which was not tied to any charges, but used to show Langford's intent to be bribed in his interactions with Blount), or his efforts to obtain a loan from a different bank branch -- was erroneously admitted (and none of it was), we could not find any basis for concluding that this evidence affected Langford's substantial rights. See id.

E.    Langford's Clothes Donations

35

Langford next says that the district court abused its discretion in generally refusing to allow him to offer testimony that Langford had donated clothing on a number of occasions to Pastor Ocie Oden. While the district court permitted Langford to introduce testimony that on one occasion Langford had given Pastor Oden an Oxxford suit, the same suit brand Blount had purchased for Langford, it would not permit additional testimony that Langford had given the Pastor a large number of other suits. The district court had rejected this evidence as improper character evidence.

Langford does not argue that this proffered evidence was anything more than an attempt to introduce evidence of his generous and philanthropic character. At no point, however, did Langford argue, or even suggest, that his purported philanthropy bore in any way on his veracity or law-abidingness. As the district court recognized, "[w]hat [Langford] planned on doing with the items he received from Mr. Blount was not the issue. The issue was whether [Langford] was influenced by receipt of the items." Langford's argument that his donation of clothes suggests that he placed a low subjective value on the payments from Blount is highly speculative -- instead, he could obtain just as much value from donating them as from keeping them. Quite simply, the district court did not abuse its discretion in ruling that this evidence was inadmissible character

36

evidence under Fed. R. Evid. 404(a), which, after all only permits evidence of a

defendant's character trait where it is "pertinent." And in any event, the district

court did allow other, more relevant evidence of Langford's "generosity," since

the Pastor <u>was</u> permitted to testify that Langford gave him "an Oxxford" suit, the

same brand given to Langford by Blount. Moreover, Blount also testified that

Langford had given him gifts too.

F.     **Langford's Payments During Shopping Trips**

Langford also complains that the district court improperly excluded

evidence that he made some purchases on his own during shopping trips with

Blount in New York. He argues that, by showing that Blount did not purchase

<u>everything</u> Langford obtained on their shopping jaunts, this would place a

different light on the purchases Blount made. The district court refused to admit

the evidence, finding it was not relevant. As far as we can tell, Langford has not

shown the relevance of any of these purchases, or even what different light they

would have shone on Blount's purchases. Whether the jury believed that

Langford made some purchases on his own from time to time during shopping

trips with Blount has no bearing on the undisputed fact that he accepted more than

$240,000 in cash, clothing and jewelry from Blount. It is not necessary for a

corrupter to meet all the needs of a corrupt public official in order to commit the crime of bribery.

### G.    Danforah's Past Activity

In addition, Langford argues that the district court abused its discretion in refusing to admit evidence of prior bad acts to impeach the credibility of Remon Danforah, a clothing store owner who testified that he received more than $50,000 in payment for clothing Blount and LaPierre had purchased for Langford.  Most of the time, Langford would pick out his clothes and run up a tab at Danforah's. LaPierre and Blount would then pay down that tab.  At trial, Langford argued that "Danforah was scamming Mr. Blount and getting paid for clothing Mr. Langford never acquired."  Blue Br. at 29-30.  In support of this theory, defense counsel impeached Danforah on his sloppy bookkeeping practices.  Langford, however, sought to go further, with evidence that in the late eighties (long before the transactions at issue in this case), Danforah got together with his relatives at a hotel every Wednesday night to gather money to send to Yassir Arafat, formerly the head of the Palestine Liberation Organization.  The district court excluded the evidence because it was not based on any convicted criminal conduct, and although it was arguably an uncharged prior wrong, it did not bear on the "credibility of the witness," "would be highly prejudicial," and "the probative

38

value would be outweighed by the prejudice or impact regardless." The district court added that defense counsel had done "an excellent job of impeaching the witness' bookkeeping ability," so that nobody "on the jury . . . thinks he has kept any records correctly in his store."

The district court did not abuse its discretion. The proffered testimony had precious little, if any probative value, and there was real danger of unfair prejudice. We cannot say the district court abused its discretion in weighing the probative value of the evidence against the danger of unfair prejudice, and refusing to admit this evidence. See Fed. R. Evid. 403.

## H.    Langford's SEC Testimony

Finally, Langford argues that the district court abused its discretion in refusing to admit portions of Langford's testimony to the Securities and Exchange Commission, while allowing other parts of his SEC testimony to be read to the jury. Langford had been deposed in 2007 by the SEC during an investigation of bond transactions in Jefferson County. The government introduced portions of Langford's testimony concerning how LaPierre had given the defendant what he termed two "loans," how he had traveled to New York for Jefferson County and went shopping with Blount but made his own purchases, how he and Blount had exchanged gifts but Langford purportedly had given Blount more than Blount had

39

ever given Langford, and how the Jefferson County Commissioners were each allowed to choose whichever investment firms they thought should be involved in Jefferson County's financial transactions. Langford then sought to introduce other parts of his SEC testimony.

Under Federal Rule of Evidence 106:

When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Fed. R. Evid. 106. "Once a part of a document can be said to have been introduced, Rule 106 does not automatically make the entire document admissible." United States v. Pendas-Martinez, 845 F.2d 938, 944 (11th Cir. 1988). Rather, "the rule permits introduction only of additional material that is relevant and is necessary to qualify, explain, or place into context the portion already introduced." Id. As the record shows, the district court carefully examined all of the proffered SEC testimony with Langford's defense counsel, line by line, to determine if additional material was necessary "to qualify, explain, or place into context the portion already introduced." Id. It determined that none of the additional testimony Langford sought to introduce satisfied this burden.

In his brief to this Court, Langford generally says that he wanted to introduce still other portions of his SEC testimony because they bore on his "intent," and explained how he had a property interest that he intended to sell to pay off the LaPierre "loans." Moreover, he claimed, the proffered testimony showed that he never talked to Blount about the LaPierre "loans," and that he was unaware of any discussions between Blount and LaPierre regarding the loans or of any money Blount gave to LaPierre, and explained why he did not report the "loans" on his ethics reports. The testimony also would have explained why Blount was chosen as a financial consultant, and why the New York trips were necessary.

Langford has not identified for this Court, however, which specific portions of his SEC testimony he sought to introduce, nor has he explained how the additional testimony was necessary. To the extent Langford suggests that we can find explanations in the trial court record, we have rejected "the practice of incorporating by reference arguments made to district courts." Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr S.A., 377 F.3d 1164, 1167 n.4 (11th Cir. 2004). At a minimum, he was obliged to cite us to the specific portions of SEC testimony he sought to introduce, and to explain in particular how each piece was relevant. See id.; see also NLRB v. McClain of Georgia, Inc., 138 F.3d 1418,

41

1422 (11th Cir. 1998) ("Issues raised in a perfunctory manner, without supporting arguments and citation to authorities, are generally deemed to be waived.").

But even if we were to undertake our own review of Langford's entire SEC testimony, we cannot discern how the omitted excerpts were necessary. Indeed, the testimony introduced already discussed the property interest he intended to use to repay the loans, explained why he chose Blount-Parrish for Jefferson County's transactions, and relayed why he went on the New York trips. Moreover, the testimony admitted did not mention Blount's role in orchestrating LaPierre's loans, nor whether Langford thought anyone besides LaPierre was behind the loans. Nor, finally, did the admitted portions say anything about whether Langford had reported the "loans" on his ethics reports. In short, even if we were hunt through all of the SEC testimony ourselves, he still has not shown how the proffered testimony was "necessary to qualify, explain, or place into context the portion already introduced." Pendas-Martinez, 845 F.2d at 944. We see no abuse of discretion here either.

## IV.

There is also no merit to Langford's challenges to the jury instructions and to the conspiracy count charging bribery. As Langford fully recognizes, these arguments are precluded by our case law. As for his argument that the district

42

court should have instructed the jury that a specific quid pro quo was required under the bribery statute, we have "expressly h[e]ld there is no requirement in [18 U.S.C.] § 666(a)(1)(B) or (a)(2) that the government allege or prove an intent that a specific payment was solicited, received, or given in exchange for a specific official act, termed a quid pro quo." United States v. McNair, 605 F.3d 1152, 1188 (11th Cir. 2010) (squarely rejecting the argument that 18 U.S.C. § 666(a)(1)(B) or (a)(2) requires a quid pro quo), cert. denied, 131 S. Ct. 1600 (2011). Similarly, as for his argument that portions of the conspiracy count should have been dismissed under Wharton's Rule, we have held that Wharton's Rule -- a narrow common law exception providing that a defendant cannot be punished for conspiracy and a substantive offense if the substantive offense itself requires the participation of two persons -- does not apply to § 666 offenses. Id. at 1216. This is so for two reasons: (1) "Congress has not expressed any intent that § 666 crimes and § 371 crimes for conspiracy to violate § 666 should merge"; and (2) "the effect of the crime of § 666 bribery is not limited to the bribe-payor and recipient, as the crime involves public corruption, which harms society as a whole." Id. Because Langford's arguments are foreclosed by McNair, we do not revisit them today.

**V.**

Finally, we are unpersuaded by his claim that the district court abused its discretion in denying Langford's post-voir dire motion for a change of venue. "The Sixth Amendment secures to criminal defendants the right to trial by an impartial jury." Skilling, 130 S. Ct. at 2912-13. That trial occurs "in the State where the . . . Crimes . . . have been committed." Id. at 2913 (quoting U.S. Const. art. III, § 2, cl. 3) (alterations in original). However, a proceeding may be transferred "to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial." Id.

Federal Rule of Criminal Procedure 21 governs venue transfers, and instructs that a "court must transfer the proceeding . . . to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a). "As the language of the Rule suggests, district-court calls on the necessity of transfer are granted a healthy measure of appellate-court respect." Skilling, 130 S. Ct. at 2913 n.11.

We have explained:

A defendant is entitled to a change of venue if he can demonstrate either "actual prejudice" or "presumed prejudice." To find the existence of actual prejudice, two basic prerequisites must be satisfied. First, it must be shown that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant

44

was guilty. Second, these jurors, it must be determined, could not have laid aside these preformed opinions and rendered a verdict based on the evidence presented in court. If a defendant cannot show actual prejudice, then he must meet the demanding presumed prejudice standard.

Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held. The presumed prejudice principle is rarely applicable, and is reserved for an extreme situation. Where a petitioner adduces evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from the community, jury prejudice is presumed and there is no further duty to establish bias.

Gaskin v. Sec'y, Dep't of Corr., 494 F.3d 997, 1004-05 (11th Cir. 2007) (quotation and emphasis omitted).

A review of the record refutes any claim of actual or presumptive prejudice. To begin, Langford's trial did not take place in Birmingham or Jefferson County, where he had been a County Commissioner when the crimes charged had been committed, and later, mayor. Rather, upon defense counsel's specific request, the district court moved the trial sixty miles from Birmingham, to Tuscaloosa County. Moreover, the record of voir dire fails to show any kind of prejudice arising in Tuscaloosa. Of the fifty-five potential jurors who served on Langford's venire, only eight responded affirmatively when asked during voir dire about exposure to publicity and "any details of the case." Only four of those eight indicated that

45

their previous knowledge of the case might interfere with their ability to be fair, and all four were subsequently removed for cause. As for the other four who had some previous knowledge of the case, they stated that, despite what they had heard previously, they would be able to set that information aside and decide the case fairly based on the facts presented in the courtroom. The district court accepted these representations, and they were sufficient to preserve Langford's right to a fair trial. See Skilling, 130 S. Ct. at 2925 ("It is sufficient if the jurors can lay aside their impressions or opinions and render a verdict based on the evidence presented in court.") (quotation and brackets omitted).

Langford also claims that the prejudice he suffered was evident because several members of the jury pool, prior to reporting for jury duty, had been encouraged by others -- friends, family, or co-workers -- to find Langford guilty. However, only three of the fifty-five potential jurors called to serve had such an experience. Of those three, just one said that her family's opinion of Langford's guilt might have an influence on her consideration of the case; she was removed for cause. Indeed, contrary to Langford's claim, only five percent of the potential jurors were exposed to the opinions of others. Whatever else this may suggest it does not show rampant pretrial publicity or prejudice in Tuscaloosa County.

Nor does the fact that three members of the venire had heard in the news that Langford had allegedly benefitted from rigged gambling machines support the general claim that Langford's trial in Tuscaloosa was unfair. Only three of the fifty-five potential jurors (approximately five percent) had heard anything about Langford's purported connection to gambling, and, as we've mentioned already, the record is clear that the two who indicated that this might affect their judgment in some way were removed from the jury. While eleven potential jurors indicated that they "disapproved of legalized gambling," a generalized opposition to gambling will likely be found among a certain percentage of the population anywhere, not just in Tuscaloosa County. Thus, moving the trial elsewhere would have had no apparent effect on that issue. In any event, no data or evidence was offered on this point.

Moreover, the record further reveals that, although eleven potential jurors were opposed to legalized gambling, forty-four were not. When Langford's counsel asked how many people "don't object to legalized gambling," the district court requested defense counsel to limit the question. When counsel narrowed the question, asking how many people had themselves gambled in the last five years, the show of hands caused defense counsel to exclaim, "Good Lord," before withdrawing the question. In the face of a trial record that was virtually barren of

47

any reference to gambling, we can hardly find a basis for the claim that the district court abused its considerable discretion in denying Langford's post-voir dire motion for change of venue.

Finally, Langford argues that the public was "well aware that after his first SEC deposition, the SEC brought him back and he took the 'fifth' numerous times." Blue Br. at 37. Yet not a single member of the venire indicated any awareness of Langford's SEC deposition, let alone that he invoked his Fifth Amendment privilege against self-incrimination. And, a single cartoon Langford relies upon to support his claim that the SEC matter was well-publicized was printed in the Birmingham paper; Langford was tried in Tuscaloosa. There is no record evidence that the Tuscaloosa venire knew anything about Langford's testimony before the SEC. As the Supreme Court has cautioned, it "may come as a surprise to lawyers and judges, but it is simply a fact of life that matters which interest them may be less fascinating to the public generally." Skilling, 130 S. Ct. at 2920 n.28 (quotation omitted). Langford has not shown any actual or presumptive prejudice.

**AFFIRMED.**