[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-15025

_____

D.C. Docket No. 2:10-cr-14096-JEM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RAVINDRANAUTH ROOPNARINE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(December 1, 2017)

Before JORDAN and JILL PRYOR, Circuit Judges, and DUFFEY,[*] District Judge.

---

[*] Honorable William S. Duffey, Jr., United States District Judge for the Northern District of Georgia, sitting by designation.

PER CURIAM:

Ravindranauth Roopnarine ("Appellant") appeals his convictions and sentence after a jury found him guilty of one count of conspiring to commit mail fraud and wire fraud, in violation of 18 U.S.C. § 1349, one count of wire fraud, in violation of 18 U.S.C. § 1343, and one count of mail fraud, in violation of 18 U.S.C. § 1341.  Appellant asserts several issues on appeal, which we address in turn.  After reviewing the extensive trial record and with the benefit of oral argument, we affirm Appellant's conviction and sentence.

## I. BACKGROUND

In 2006, Appellant developed a scheme to acquire more than 181 residential properties in Florida using "straw buyers" to secure mortgages.  The scheme included Appellant directing other scheme participants to incorporate three Florida corporations for use in facilitating purchases of the homes: (1) DKR Florida; (2) Vero Lakes New Home Center; and (3) Century Star Realty Group/Sunrise New Homes.

Appellant's scheme generally involved a "straw buyer" purchasing a home from a homebuilder who agreed with Appellant to sell homes for a price below the home's fair market value.  Appellant gave the straw buyer $10,000 to serve as the home purchaser.  The straw buyer applied to a mortgage lender for a loan to purchase the home.  The straw buyer applied for a loan in the amount of the fair

2

market value purchase price of the home, not the discounted price for which the homebuilder agreed with Appellant to sell the home.  The straw buyer used his own credit information to secure the loan.

Appellant received that portion of the mortgage loan represented by the difference between the discounted home purchase price and the amount of the loan based on the home's fair market price.  Appellant promised the straw buyers that he would make the mortgage loan payments with monies he received in renting the homes.  Appellant also told straw buyers that when Appellant sold a home for a price greater than the purchase price mortgage, he would split the excess sale funds with the straw buyer.  Mortgage lenders were not told of these financial arrangements to which Appellant and his straw buyers agreed.

Soon after the straw purchases commenced, Appellant had difficulty covering mortgage payments because he could not rent the homes and because he used the loan proceeds for personal expenses.  To sustain the mortgages he sometimes used loan proceeds from new loans to make payments on existing mortgages.  Of the 181 homes that Appellant convinced straw buyers to purchase, all but seven were foreclosed on by mortgage lenders.

In 2008, Ikramul Azam Hosein, one of Appellant's straw buyers, and his wife, reported Appellant to the FBI after Appellant stopped making mortgage payments on Hosein's home and the bank foreclosed on the property.

3

On December 9, 2010, a federal grand jury in the Southern District of Florida returned an 11-count indictment against Appellant, which included charges for wire fraud, under 18 U.S.C. § 1343, mail fraud, under 18 U.S.C. § 1341, conspiracy to commit wire fraud, mail fraud, and bank fraud, under 18 U.S.C. § 1349, money laundering, under 18 U.S.C. § 1956(a), and conspiracy to commit money laundering, under 18 U.S.C. § 1956(h).  On March 7, 2016, Appellant's jury trial began.  Upon the government's motion, the District Court dismissed certain of the counts.  The jury ultimately convicted Appellant of mail fraud, wire fraud, and conspiring to commit mail fraud and wire fraud.  On July 14, 2016, the District Court sentenced Appellant to 262 months imprisonment, and ordered him to pay more than $9 million in restitution.

## II. STANDARDS OF REVIEW

"We review challenges to the sufficiency of the evidence in criminal cases *de novo*, viewing the evidence in the light most favorable to the government." United States v. Dominguez, 661 F.3d 1051, 1061 (11th Cir. 2011); see also United States v. Williams, 527 F.3d 1235, 1244 (11th Cir. 2008).  The district court's "evidentiary rulings" are reviewed "for a clear abuse of discretion."  United States v. Dodds, 347 F.3d 893, 897 (11th Cir. 2003).  Jury instructions challenged in the district court are reviewed "*de novo* to determine whether the instructions misstated the law or misled the jury to the prejudice of the objecting party."

United States v. House, 684 F.3d 1173, 1196 (11th Cir. 2012) (quoting United States v. Felts, 579 F.3d 1341, 1342 (11th Cir. 2009)).  We review *de novo* the interpretation and application of the Sentencing Guidelines, but we review the underlying factual findings for clear error.  United States v. Rodriguez, 732 F.3d 1299, 1305 (11th Cir. 2013).

### III. DISCUSSION

Appellant challenges his conviction on the following grounds: (1) the evidence was insufficient to support his conviction; (2) the district court erred in its evidentiary rulings, including (i) limiting defense counsel's cross-examination of government witness Jose Cadena and (ii) allowing an undercover government agent to testify without disclosing his true name; (3) the district court erred by giving a Pinkerton and deliberate ignorance instruction; and (4) the district court wrongfully calculated the loss amount and gross receipts under the sentencing guidelines.

### A.

Appellant challenges whether the evidence was sufficient to support his substantive convictions of mail fraud and wire fraud and his conviction of conspiracy to commit mail fraud and wire fraud.  At issue is whether a reasonable fact-finder could have determined that the evidence proved the defendant's guilt beyond a reasonable doubt.  United States v. Langford, 647 F.3d 1309, 1319 (11th

Cir. 2011); see also United States v. Smith, 459 F.3d 1276, 1286 (11th Cir. 2006). We will not disturb the verdict unless no reasonable trier of fact could find guilt beyond a reasonable doubt. United States v. Lee, 603 F.3d 904, 912 (11th Cir. 2010). "[C]ircumstantial evidence may be used to establish an element of a crime, even if the jury could draw more than one reasonable inference from the circumstantial evidence, and in judging sufficiency of the evidence, we apply the same standard whether the evidence is direct or circumstantial." Langford, 647 F.3d at 1319.

To establish that Appellant committed wire fraud, the government must prove that he: (1) intentionally participated in a scheme to defraud; and (2) used wire communications to further that scheme. 18 U.S.C. § 1343; see Belt v. United States, 868 F.2d 1208, 1211 (11th Cir. 1989). In order to establish that Appellant committed mail fraud, the government must prove that he: (1) intentionally participated in a scheme to defraud; and (2) used the mails to further that scheme. 18 U.S.C. § 1341; see United States v. Wingate, 997 F.2d 1429, 1432 (11th Cir. 1993). Because the elements of wire fraud are analogous to those of mail fraud, the statutes generally are interpreted similarly. Belt, 868 F.2d at 1211 ("The wire fraud statute tracks the language of the mail fraud statute . . . [and] [t]he statutes are given a similar construction and are subject to the same substantive analysis."); see also Langford, 647 F.3d at 1320.

6

*1.    Wire Fraud*

Appellant's wire fraud conviction involved the transfer of $171,000, on or about October 12, 2007, from Washington Mutual Bank to an escrow account for the purchase of a property at 373 N.E. 26th Place, Unit 102, Homestead, Florida (the "26th Place Property").  The record reveals that Ikramul Azam Hosein ("Hosein"), one of Appellant's straw buyers, testified at trial that he signed a fraudulent mortgage loan application for the property.  Hosein admitted that he signed the loan documents for the purchase of the property, that his gross monthly income of $15,000 stated on the documents was false, and that he did not pay the amount stated on the documents for the closing of the property.  Hosein also identified documents establishing that the principal amount loaned for the property was $171,000, and that the loan proceeds were wired from Washington Mutual Bank to an escrow agent in Florida.

The record includes testimony from Washington Mutual Bank underwriter Jose Cadena, who testified during trial that he reviewed the loan file for the 26th Place Property, and would have considered "[i]ncome, credit, assets, the collateral, and the down payment" in making the underwriting determination.  Tr. Transcript at 108-09 (Doc. 360).  The testimony included the following exchange regarding the materiality of who provided the down payment for the property:

7

Q:    So if an underwriter learned that the down payment was not coming from the borrower, would that be significant and material?

A:    Yes, it would.

Q:    Why is that?

A:    The borrower has nothing in the transaction, no risk.  The bank is putting up all the risk and it would have been potentially ineligible if we knew where it came from.  Gifts are allowed from family members, but not from nonfamily members.
. . .
That way they have something to lose.  Right now if they have nothing in the transaction, they've really lost nothing if there is a loss on the property and the bank takes all the risk.

Q:    And if an underwriter were to learn that the source of a down payment was not coming from the borrower but from somewhere or someone else, another company for example, would that be material?

A:    Yes.

Tr. Transcript at 112-13 (Doc. 360).  The record shows the evidence was sufficient to support Appellant's wire fraud conviction, and we find that a reasonable fact-finder could have determined that the evidence proved Appellant's guilt beyond a reasonable doubt.

2.    *Mail Fraud*

Appellant's mail fraud conviction, according to the government's indictment, is based on a mailing, on or about October 12, 2007, of a warranty deed and mortgage for a property located at 2730 N.E. 4th Street, Unit 205,

8

Bldg. 19, Homestead, Florida (the "4th Street Property"). Hosein, the straw buyer, testified about this property.[1]

Appellant challenges the sufficiency of the evidence to support the mailing element of the offense, claiming there is no evidence the mail was used to transmit documents received by the Miami-Dade Office of the County Recorder, as alleged in the indictment. The government has consistently argued that loan instruments and checks were sent from Ascendant Title Services, Inc. ("Ascendant") to the Miami-Dade Office of the County Recorder by mail.

The indictment reads, in relevant part, "Miami-Dade County clerk received from Ascendant Title Services, Inc., via U.P.S. a warranty deed and mortgage." Indictment at 14 (Doc. 7). The government, during trial, in its brief, and in oral argument, relied upon Government Exhibit 6 ("GX6"), and specifically Government Exhibit 6A ("GX6A"), to support the mailing element of the charged conduct. GX6, according to the government's exhibit list filed with the district court, is the Countrywide Bank Loan File for the property, and includes the following three documents: (1) "Miami-Dade Clerk of Court's certification of origin of fax confirming mailing with print screens of clerk's computer system and

---

[1] Hosein admitted that he did not pay the closing costs as stated in the property's loan documents, did not attend the closing, did not receive a key to the house, and did not make mortgage payments on the home.

9

recorded documents (composite)" (GX6A); (2) "HUD-1 Buyer Settlement Statement" ("GX6B"); and (3) "Uniform Residential Loan Application" ("GX6C").  Tr. Ex. List at 2 (Doc. 318).

During proceedings relating to Appellant's motions for judgment of acquittal, the government argued:

> Count 6, Your Honor, the entire file first of all for that home transaction, that real estate transaction, is in evidence.  Part of what's in evidence, and I believe it has been attached to an exhibit that was talked about in court is a proof of mailing, 6A.
> . . .
> [T]here has been direct evidence and proof about a mailing. . . . We didn't bring in a witness to say – it's true, we didn't bring in someone to say solely the mail was used on this count, this is how, here's the letter, but that exhibit is in evidence, it's already been admitted, and we're going to refer to it in our closing argument and point the jury to it.

Supp. Tr. Transcript at 5-6 (Doc. 377).  In its appellate brief, the government argued, "The documents further reflected that they had been 'received by U.S. mail' by the Miami-Dade County Clerk of the Circuit and County Courts."  In oral argument, the government reiterated its position, stating:

> What was mailed was . . . some form of deed to the county appraiser's office.  That deed had . . . the HUD-1 and the Uniform Residential Loan Application attached to it, so it was clear from, I think it was a fax or a letter to the County Court saying this is the documentation in connection with this property and it says on it "received by mail."  And of course, like I said, Hosein authenticated those documents.  He said, "These are the documents that I originated in connection with this transaction."

See Oral Argument at 17:17- 17:57.

10

Upon a careful review of the documents sent from Ascendant, and the record generally, we cannot conclude that the documents were mailed to the Clerk of Court, rather than some other transmission means.  Neither the documents sent by Ascendant, the remaining exhibits, nor the trial testimony provide evidence that the Miami-Dade Clerk of Court received the warranty deed and mortgage for the 4th Street Property "via U.S. mail."  There is no record evidence that documents were "received" by the Clerk of Court by mail and there is no evidence from which a mailing can be inferred.

What GX6 does include is a Uniform Residential Loan Application for the 4th Street Property indicating that the application, signed by Hosein, a purchaser recruited by Appellant, was received by mail on July 17, 2007 by Kamla Seecharan.  Ms. Seecharan, a co-conspirator who pleaded guilty in this case, was co-owner, together with Appellant, of Century Star Mortgage Group, Inc. Seecharan is represented as conducting the Hosein loan application interview. Hosein's testimony appears to corroborate this fact.  The following exchange occurred during trial:

> A:   And I was presented with closing document for a second property.
> Q:   Do you recall who gave those to you?
> A:   Kamla.
> Q:   And how was that delivered to you?
> A:   I believe by DHL package.

Tr. Transcript at 75 (Doc. 360).  These facts provide substantial evidence from

which a reasonable jury could conclude that Appellant caused the mails to be used, and that the mailing of the application and loan document was a step in furtherance of the fraudulent scheme, in this case the transaction involving the 4th Street Property. See Pereira v. United States, 347 U.S. 1, 8-9 (1954) ("Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used."); see also United States v. Ross, 131 F.3d 970, 985 (11th Cir. 1997). The fact that "DHL" was the means used to mail the documents, as opposed to the U.S. mail, is irrelevant. United States v. Silvestri, 409 F.3d 1311, n.14 (11th Cir. 2005) ("In 1994, Congress expanded the provisions of § 1341to include any 'matter whatever to be sent or delivered by any private or commercial interstate carrier.' Deliveries by DHL are covered under the expanded definition.") (citation omitted).

We further find that any variance between the alleged proof of mailing in the indictment and the evidence presented at trial is not grounds for reversal. "The standard of review for whether there is a material variance between the allegations in the indictment and the facts established at trial is twofold: First, whether a material variance did occur, and second, whether the defendant suffered substantial prejudice as a result." United States v. Lander, 668 F.3d 1289, 1295 (11th Cir. 2012); United States v. Dennis, 237 F.3d 1295, 1300 (11th Cir. 2001).

12

"A 'variance' occurs when the evidence at trial establishes facts materially different from those alleged in the indictment." United States v. Caporale, 806 F.2d 1487, 1499 (11th Cir. 1986). Substantial prejudice is present if "the proof at trial differed so greatly from the charges that [the defendant] was unfairly surprised and was unable to prepare an adequate defense." United States v. Richardson, 532 F.3d 1279, 1286-87 (11th Cir. 2008).

We conclude that it is not a material variance that Appellant's co-conspirator Kamla Seecharan, and not the Miami-Dade Clerk of Court, was the person who received by mail documents by which the fraudulent loan was processed. See, e.g., United States v. Roberts, 308 F.3d 1147, 1156 (11th Cir. 2002) (holding there was no material variance where the date of the offense cited in the indictment was a year after the crime was committed, and the proof at trial showed that the offense was committed on the earlier date, because the defendant had notice of the charges and there was no possibility that he would be prosecuted again for the same offense); Thompson v. Nagle, 118 F.3d 1442, 1453 (11th Cir. 1997) (holding there was no material variance where evidence suggested cause of death differed from indicted charge). Likewise, there is not a material variance that the testimony at trial established that DHL, rather than U.P.S., was used. Id. Here, Appellant was clearly on notice that he was charged with fraud in connection with the purchase of and loan for the 4th Street Property, and that the mails were used to process this

13

fraudulent transaction.  The mailing that occurred in this transaction involved the transmission of documents related to the loan, and evidence of the mailing of the document was sent to and received by the Miami-Dade Clerk of Court.  The variance, even if there was one, was not material.

Even if the difference in proof of mailing constituted a material variance, we find that it did not prejudice Appellant.  See Caporale, 806 F.2d at 1500 (no prejudice where the variance "did not alter the crime charged, the requisite elements of proof or the appropriate defenses in a significant manner"); see also United States v. White, 349 F. App'x 381, 382 (11th Cir. 2009) (finding material variance did not prejudice the defendant where the indictment incorrectly stated one of the seventeen characters of a VIN number); United States v. Teague, 12 F. App'x 759, 766 (10th Cir. 2001) ("Therefore, we hold that despite the technically imperfect address given in the indictment to indicate where the crimes occurred, the indictment plainly provided [the defendant] with sufficient detail and adequate notice of the pending charges and evidence against him."); cf. Lander, 668 F.3d at 1295-96 (finding a material variance where "the Government trie[d] to rely on a scheme to defraud entirely different from the one alleged in the indictment to support" the defendant's conviction resulting in prejudice to the defendant because

14

"the indictment failed to put [the defendant] on notice of the crime for which he was convicted").[2]

The indictment was sufficient to put Appellant on notice of the crime for which he was charged and convicted. It identified the substantive crime, the approximate date on which the crime allegedly occurred, the facts underlying the fraudulent scheme, and the property's address. That the mailing was proved by a means other than what was articulated in the indictment, which was nonetheless included in the documents received by the Miami-Dade Clerk of Court, did not prevent Appellant from preparing his defense. The government's exhibits were provided to Appellant, and GX6C clearly shows that a mailing—although different from the one described in the indictment—occurred.

We conclude that there was sufficient evidence to support, and a reasonable jury could conclude, that Appellant was guilty beyond a reasonable doubt of mail fraud, including that Appellant caused the mails to be used to further the fraudulent purchase of this property.

### 2. The Conspiracy

To sustain a conspiracy conviction under 18 U.S.C. § 1349, the government must prove the following elements: "(1) agreement between two or more persons

---

[2]     We recognize that Federal Appendix decisions are unpublished, and thus not binding on the panel. We note, however, that they are helpful in explaining the legal principles that apply.

to achieve an unlawful objective; (2) knowing and voluntary participation in that agreement by the defendant; and (3) an overt act in furtherance of the agreement." United States v. Broughton, 689 F.3d 1260, 1277 (11th Cir. 2012); see also United States v. Smith, 934 F.2d 270, 275 (11th Cir. 1991).  Although an agreement may be shown by direct evidence, "[t]he very nature of conspiracy frequently requires that [it] be proved by inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme."  United States v. Toll, 804 F.3d 1344, 1355 (11th Cir. 2015).

The record is fraught with evidence, both direct and circumstantial, that would permit a reasonable jury to conclude that Appellant participated in a conspiracy to commit mail and wire fraud.  Appellant recruited his co-conspirators to incorporate real estate companies that he controlled, but on which his identity was not disclosed.  He directed his co-conspirators how to use the real estate companies to further his scheme.  He recruited straw buyers by providing funds to make down payments on the purchases, promising to pay the payment obligations under the mortgage loans, and promising a share of the profits generated upon sale of the properties.  Testimony from Hosein and other witnesses established that Appellant orchestrated, directed, and managed the scheme.  Hamewattie Balkissoon and Kamla Seecharan, Appellant's co-conspirators, testified at trial that the corporations that processed the fraudulent mortgage loan applications and the

16

bank accounts in which the loan proceeds were deposited were controlled by

Appellant.  Appellant managed and controlled the companies, found the buyers,

and instructed his co-conspirators how to process the loan applications and pay the

mortgages.  Seecharan, for example, stated:

> Q:    Did [Appellant] have any directions for you as to where and
>        when to use his name?
> A:    Everybody knew it was Ravi's company.  I mean, there was – it
>        was never hidden.  He didn't hide the fact – Ravi tells
>        everybody everything.  So usually everybody that knows Ravi
>        knows that he owns the real estate and mortgage, I'm the
>        broker.

Tr. Transcript at 188 (Doc. 359).  Seecharan testified about Appellant's extensive

involvement in the mortgage application process, including the review and revision

of applications.  She testified:

> Q:    So how regularly did you keep him informed of the details of
>        these transactions?
> A:    Every day we talked.  Whatever is going on on a daily basis in
>        the company, he's fully aware.
> Q:    Did you show him documents?
> A:    Yes, he have seen documents.
> Q:    What kind of documents?
> A:    He has seen the HUDS. . . .
>        . . .
> Q:    Did he expect you to share every detail with him?
> A:    Yes.  If you don't, he gets angry like you're hiding something
>        from him.

Tr. Transcript at 190 (Doc. 359).

We conclude that the evidence was sufficient to support Appellant's

conspiracy conviction, and the underlying substantive wire and mail fraud

17

convictions. The record includes testimony, loan applications, and other documents that would permit a reasonable jury to conclude, beyond a reasonable doubt, that Appellant committed these offenses.[3]

B.

Appellant next challenges two of the district court's evidentiary rulings. First, Appellant argues the district court wrongly limited defense counsel's cross-examination of government witness Jose Cadena. Second, Appellant contends the district court improperly permitted the government's undercover witness to testify without disclosing his real name.

### 1.    *Testimony of Jose Cadena*

At trial, the government offered Jose Cadena, an underwriter for Washington Mutual Bank, to testify about the review of Hosein's mortgage loan applications and "what would be material to a Washington Mutual underwriter." Tr. Transcript at 109 (Doc. 360). Appellant argues that the district court improperly restricted his cross-examination of Cadena. The following exchange between defense counsel and the district court took place:

> Defense counsel:   Judge, if you're not going to let me cross-examine on materiality, then I am finished.

---

[3]    We reach this conclusion having found, as discussed below, that the district court did not err in the evidentiary rulings and instructions to the jury challenged by Appellant.

18

Court:          No, I will not let you cross-examine on the alleged
                failure of the bank to do what you think they
                should have done.  That, I think the Eleventh
                Circuit has spoken on.  So govern yourself
                accordingly.

Tr. Transcript at 143 (Doc. 360).  Defense counsel repeatedly attempted to ask

Cadena questions suggesting the bank was negligent in not investigating the

income claimed by mortgage applicants.  The district court sustained the

government's objection to the questions.  The district court noted, during

Appellant's cross-examination of Cadena, that it would instruct the jury that "any

negligence on the part of the bank is not a defense to this case."  See, e.g., United

States v. Svete, 556 F.3d 1157, 1165 (11th Cir. 2009) ("A perpetrator of fraud is no

less guilty of fraud because his victim is also guilty of negligence.").  The district

court was correct that negligence on the part of the bank has no bearing on whether

a misrepresentation is material.  See id.  Therefore, the district court did not err in

restricting cross-examination of Cadena on alleged shortcomings of Washington

Mutual's application review process.

A careful review of the trial record also shows that defense counsel in fact

extensively cross-examined Cadena.  The transcript of defense counsel's cross-

examination continues for approximately ten pages, and it supports that defense

counsel asked Cadena about matters such as verification of facts disclosed in the

loan applications, how the HUD-1 is prepared, why Cadena considered certain

19

items material, and whether underwriters rely on brokers for the submission of accurate information.

We conclude that the district court did not err in restricting defense counsel's cross-examination, and it properly limited defense counsel's cross-examination when defense counsel attempted to imply that the negligence of the financial institutions in some way negated her client's intent or culpability.

2.    *Testimony of Government's Undercover Witness*

Appellant next contends that the district court improperly permitted the government's undercover witness to testify without disclosing his real name. The following exchange occurred at the trial immediately before the undercover witness testified:

Defense counsel:    Judge, I just think on the record on – may not be in the presence of the jury, but these witnesses need to be identified by their true identities and names for the record. I think that we've agreed, because the government has security concerns since they are undercover agents, that they can use their undercover names in front of the jury. But I still think we need to put on the record who they are.
. . .
My understanding was they were going to put on the record, outside the jury, and that's why I suggested sidebar, the true name of their witness and that we would agree he could use his undercover name in front of the jury. But you need to identify who this witness is so that in the future, if something happens, and let's say this man gets arrested for lying or something comes out

20

> that, you know, he fabricated all these things, I don't know, it's happened.
>
> Court:            You have a continuing responsibility to the court, as officers of the court, to let me know if something like that were to happen.
>
> Government:     Correct, Your Honor.  Under Giglio and just generally.

Tr. Transcript at 162-63 (Doc. 360).

The record shows that defense counsel agreed to permit the use of the witness's alias during trial.  The record also shows that defense counsel objected to the government's withholding of the witness's true identity because of some future need for the identity of the witness to be known.  Defense counsel did not argue or assert an objection based on some claimed prejudice as a result of withholding the witness's identity.[4]  The record shows further that defense counsel conducted a thorough cross-examination of the undercover witness.  Appellant waived his objection to the witness's use of an alias at the trial.  Appellant agreed to the use of an alias for security reasons, and he cannot now claim this agreed-upon use was error.

On appeal, Appellant contends that the district court erred by allowing the witness to testify under an alias before the jury.  The argument is waived because

---

[4]    Appellant's counsel made a number of objections during the witness's direct examination, such as relevancy and that a question called for speculation.  The  district ruled on each of these.  She did not object based on the witness's use of an alias or on the grounds that allowing the witness to use an alias impacted her cross-examination.

21

Appellant's agreement to the use of the alias also constituted an invitation to the district court to allow the use of the alias. "It is a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party." United States v. Ross, 131 F.3d 970, 988 (11th Cir.1997) (internal quotations omitted). "The doctrine of invited error is implicated when a party induces or invites the district court into making an error." United States v. Stone, 139 F.3d 822, 838 (11th Cir. 1998). "Where invited error exists, it precludes a court from invoking the plain error rule and reversing." Ford ex rel. Estate of Ford v. Garcia, 289 F.3d 1283, 1294 (11th Cir. 2002) (internal quotations omitted).

Although defense counsel objected to the district court's refusal to have the undercover agent state his true name at sidebar, Appellant has not shown that he was prejudiced by the denial of this specific request. United States v. Pepe, 747 F.2d 632, 656 & n.33 (11th Cir. 1984) (requiring showing of "specific prejudice caused by [] nondisclosure"); see also Alford v. United States, 282 U.S. 687, 692 (1931) ("Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them."). Appellant's only stated concern was that something may happen "in the *future*" affecting the agent's credibility. But these hypothetical future events would not have been presented to

22

the jury and Appellant made no argument that he was unable to effectively "place a witness in the proper setting" before the jury.  United States v. Alston, 460 F.2d 48, 52 (5th Cir. 1972); see also United States v. Gutierrez de Lopez, 761 F.3d 1123, 1148-49 (10th Cir. 2014) (harmless error where "questioning allowed [the defendant] an opportunity to undermine [the witness's] credibility despite her inability to ask about their true identities").  To the contrary, the record reflects a thorough cross-examination.

Appellant agreed to the use of an alias and in doing so waived any objection to it.  To the extent it was error to allow the alias to be used before the jury, the claimed error was invited by Appellant.  We conclude that Appellant has not shown he suffered any prejudice by the refusal to disclose the agent's undercover alias name to the defense.

## C.

Appellant argues that the district court erred in giving a Pinkerton[5] and a deliberate ignorance instruction in the district court's charge.

We review jury instructions "*de novo* to determine whether the instructions misstated the law or misled the jury to the prejudice of the objecting party." United States v. Gibson, 708 F.3d 1256, 1275 (11th Cir. 2013); see also United States v. Clay, 832 F.3d 1259, 1310 (11th Cir. 2016).  We will not reverse a

---

[5]     Pinkerton v. United States, 328 U.S. 640 (1946).

23

conviction based on a jury instruction challenge "unless we are 'left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations.'" Gibson, 708 F.3d at 1275. "When the jury instructions, taken together, accurately express the law applicable to the case without confusing or prejudicing the jury, there is no reason for reversal even though isolated clauses may, in fact, be confusing, technically imperfect, or otherwise subject to criticism." Id. The Supreme Court has observed that "in reviewing jury instructions, our task is also to view the charge itself as part of the whole trial," noting that "[o]ften isolated statements taken from the charge, seemingly prejudicial on their face, are not so when considered in the context of the entire record of the trial." United States v. Park, 421 U.S. 658, 674-75 (1975) (internal quotations omitted).

*1.    The Pinkerton Instruction*

Appellant contends that the district court erred when it instructed that, if the jury found Appellant guilty of conspiracy, the jury could find him guilty of the substantive offenses of mail fraud and wire fraud based on the acts of his co-conspirators. The district court, upon the government's request, and after overruling Appellant's objections at a charge conference, gave the following instruction to the jury:

> During a conspiracy, if a conspirator commits a crime to advance the conspiracy toward its goals, then in some cases a co-conspirator may be guilty of the crime even through the co-conspirator did not participate directly in the crime. So, regarding Counts [Three] and

24

[Six], if you have first found the defendant guilty of Count [One], you may also find the defendant guilty of any of the crimes charged in Counts [Three] and [Six] even though the defendant did not personally participate in the crime. To do so, you must find beyond a reasonable doubt:

One, during the conspiracy, a conspirator committed the additional crime charged to further the conspiracy's purpose.

Two, the defendant was a knowing and willful member of the conspiracy when that crime was committed.

And three, it was reasonably foreseeable that a co-conspirator would commit the crime as a consequence of the conspiracy.

Tr. Transcript at 12-13 (Doc. 362). Appellant does not argue that this instruction was defective. Instead, he contends that the district court erred because (1) "[t]he evidence did not support giving a Pinkerton instruction"; and (2) the instruction "undermined the whole defense theory of the case—that [Appellant] never had intent to defraud."

As we conclude above, the evidence was more than sufficient to support Appellant's conspiracy conviction. We find that the instructions issued by the district court in this case correctly and adequately stated the relevant law that applied, including that Appellant could be convicted for reasonably foreseeable co-conspirator criminal conduct engaged in to advance the conspiracy towards the "goals" of the conspiracy. This specifically includes the criminal conduct in which straw buyers engaged. The record here supports that it was appropriate to give the Pinkerton charge.

25

### 2.    *The Deliberate Ignorance Instruction*

Appellant next argues that the district court erred in giving a deliberate ignorance instruction.[6] The district court gave the following instruction to the jury:

> If a defendant's knowledge of a fact is an essential part of the crime, it's enough that the defendant was aware of a high probability that the fact existed, unless the defendant actually believed that the fact did not exist.

Tr. Transcript at 14 (Doc. 362).  Appellant does not object on the ground that the charge is incorrect.  He only objects on the ground that the instruction prejudiced him because it "basically negate[d] intent," which in turn allegedly lowered the government's burden to prove his intent beyond a reasonable doubt.

The trial court instructed the jury on approximately six occasions that the government was required to prove each element of each charge against the defendant and that proof beyond a reasonable doubt was required.  The court specifically instructed the jury that the government was required to prove intent to defraud beyond a reasonable doubt.  The record shows the jury was plainly instructed that it was the government's burden to prove intent beyond a reasonable doubt.  The record also shows there was sufficient evidence to support giving the instruction.

---

[6]    This instruction is sometimes referred to as a "deliberate indifference" instruction. "Ignorance" is the more appropriate term, and it is used in this Opinion.

26

We have stated that a "deliberate ignorance instruction is appropriate only when there is evidence in the record 'showing the defendant purposely contrived to avoid learning the truth.'" United States v. Stone, 9 F.3d 934, 937 (11th Cir. 1993), cert. denied, 513 U.S. 833 (1994) (citing United States v. Barbee, 968 F.2d 1026, 1033 (10th Cir. 1992)).  We have also cautioned "against instructing juries on deliberate ignorance when the evidence only points to either actual knowledge or no knowledge on the part of the defendant."  Id.  These general principles are difficult to apply in a fraud as complex as the one at issue here, where the defense was that Appellant's conduct was simply a commercial venture gone awry because of market conditions.  The record supports the trial court's decision to give the instruction.

Appellant does not challenge the accuracy of the instruction, but objects that it relieved the government of proving Appellant's intent to commit fraud and to enter into the conspiracy.[7]  The instruction, as given, stated: "If a defendant's knowledge of a fact is an essential part of the crime, it's enough that the defendant was aware of a high probability that the fact existed."  Tr. Transcript at 14 (Doc. 362).  There was, in this case, an adequate factual basis for the district court to give the deliberate ignorance instruction from which the inference could be drawn that

---

[7]    The instruction given was based on Special Instruction No. 8 from the Eleventh Circuit Pattern Jury Instructions in Criminal Cases.

27

Appellant engaged in purposeful conduct to avoid knowing essential facts of the crime. The defense in this case was that Appellant engaged in ordinary commercial transactions and did not intend to defraud lenders. He argued, including in this appeal, that the facts showed he engaged in regular, ordinary real estate transactions. The government argued that Appellant was fully aware of the fraud in which he engaged, but also sought to disguise his involvement in certain key transactions by instructing others not to disclose his association with the scheme.

The evidence supports that Appellant attempted to make all or part of the scheme appear to be legitimate. Appellant sought to insulate himself from knowing the particulars of specific scheme elements, knowing there was a high probability that the conduct of his co-conspirators was fraudulent, and that he could be held criminally accountable for it.

For example, Appellant recruited and facilitated straw borrowers to apply for loans. Appellant was not listed on loan applications or documents and the evidence shows that Appellant dispatched straw borrowers to obtain purchase money mortgages. Additionally, he directed his co-conspirators to leave his name off of documents incorporating his real estate companies. This evidence would allow a jury to infer that Appellant, who was knowledgeable of the lending process, purposely avoided knowing the details of the straw purchases, because not

28

knowing allowed him to maintain his defense that there was no fraud in the borrowing activities.  A jury in this case was entitled to decide if Appellant chose not to know of the details of the fraudulent scheme.  These facts, coupled with Appellant's defense, were an appropriate basis to allow the jury to consider whether Appellant chose to be deliberately ignorant of essential elements of the crime—here, the conduct of straw borrowers.

What we have said before is true in this case—a deliberate ignorance instruction is "properly given" where "the evidence supports both actual knowledge and deliberate ignorance."  United States v. Arias, 984 F.2d 1139, 1143 (11th Cir. 1993) (internal quotations omitted).  Viewing the charge and the record as a whole, we find no reversible error in the court's instructions to the jury.[8]

### D.

Appellant argues that the district court improperly calculated loss amount and gross receipts in determining the Sentencing Guidelines, and, as a result, imposed an inappropriate sentence.

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  Gall v. United States, 552 U.S. 38,

---

[8]    We have noted before that even where there was no basis for a deliberate ignorance instruction, it was harmless error beyond reasonable doubt to give it where the evidence of actual knowledge independently supported a conviction beyond a reasonable doubt.  Griffin v. United States, 502 U.S. 46, 58 (1991); Stone, 9 F.3d at 937.  Here, there was more than sufficient evidence of actual knowledge.

49 (2007); see also United States v. Campbell, 765 F.3d 1291, 1298 (11th Cir. 2014). If "a defendant challenges one of the factual bases of his sentence . . . the Government has the burden of establishing the disputed fact by a preponderance of the evidence." Rodriguez, 732 F.3d at 1305. The district court must then, using the Guidelines range as the benchmark, weigh all of the factors to determine whether they support the sentence requested by a party. Gall, 552 U.S. at 49-50.

1.    *Loss Amount*

For crimes involving fraud or deceit, such as this one, the Sentencing Guidelines increase the offense level based on the amount of the loss. U.S.S.G. § 2B1.1(b) (2015); see also United States v. Wright, 862 F.3d 1265, 1274 (11th Cir. 2017). The "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). On July 14, 2016, the district court sentenced Appellant to 262 months imprisonment, followed by 60 days of supervised release, and ordered him to pay more than $9 million in restitution. The district court determined, without specifically adopting a particular loss amount, that the government established a loss amount of more than $25 million, which requires 22 levels to be added to the base level offense. The district court considered, however, the impact of sentencing Appellant pursuant to the next lowest category, which involves a loss amount of more than $9.5 million but not more than $25 million. This loss amount category requires adding 20 levels to the base level

30

offense.  The high end of the applicable advisory guideline for a loss amount of less than $25 million and the low end of the applicable advisory guideline for a loss amount of more than $25 million resulted in the same recommended sentence—262 months.  As a result, the district court stated the following:

> If I went below the $25 million, it would be my intention to sentence the defendant at the high end of the guidelines; and if I go above that, it would be my intention to sentence him at the low end of the guidelines.  So I don't think it has any practical difference in this matter.  I don't think that you have proven sufficient to get it below the $25 million.  But even if you did, it would still be at the very high end below $25 million.  And so I'm ruling against you on your objection, not on everything, but on the fact that it doesn't really make any difference because it's still over $25 million, and if it were to slip below $25 million, it would not make any difference to me in my evaluation of the sentencing to Mr. Roopnarine.

Tr. Transcript at 47 (Doc. 354).

The district court thus concluded that it would impose the same sentence regardless of the specific loss amount, which was disputed and discussed at length during the sentencing proceedings on July 14, 2016.  "A Sentencing Guidelines miscalculation is harmless if the district court would have imposed the same sentence without the error."  United States v. Barner, 572 F.3d 1239, 1248 (11th Cir. 2009); see also United States v. Scott, 441 F.3d 1322, 1329 (11th Cir. 2006) ("Notwithstanding the district court's error, we are not required to vacate the sentence and remand the case if the court would have likely sentenced [the defendant] in the same way without the error.").  We conclude, without

31

determining the exact loss amount at issue here, that the district court did not clearly err in sentencing Appellant under the guideline for a loss amount of more than $25 million and less than $65 million because he would have nevertheless sentenced Appellant to 262 months.

2.    *Gross Receipts*

The Sentencing Guidelines also require the district court to enhance a defendant's base offense by two levels if "the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense." U.S.S.G. § 2B1.1(b)(16)(A). Gross receipts include "all property, real or personal, tangible or intangible, which is obtained directly or indirectly" as a result of the offense. U.S.S.G. § 2B1.1, cmt. n.12(B).

Appellant argues on appeal that the evidence did not support the district court's finding that he personally received more than $1 million in gross receipts. The following exchange between the government and the district court occurred at the sentencing proceedings on July 14, 2016:

Government:    First and foremost, we have Government Trial Exhibit 1, which is the summary chart presented by the defendant to the undercover FBI agents laying out in detail the operation and scope of his scheme in which the central column was entitled Robby's Take and aggregated over $6 and a half million at the bottom of the column. In addition, there was preponderance of the evidence in the form of testimony by the witnesses at trial describing how all proceeds were considered to

> belong to him and over a million dollars were at various times in the aggregate transferred to him and his wife.

Court:    My recollection of the testimony is that your client claimed far more than a million dollars.  Now, he might have been lying because, you know what, fraudsters do lie sometimes.  But I think in this case he was lying to his detriment.  He clearly indicated that he was receiving far more than a million dollars.

Tr. Transcript at 46 (Doc. 354).  The district court heard testimony on the issue, considered it, and concluded that it was reasonable to estimate from the testimony and evidence presented during the trial that Appellant took home more than $1 million in gross receipts.  We conclude that the district court did not clearly err in reaching its determination.

## IV. CONCLUSION

For all of the foregoing reasons, we affirm Appellant's conviction and sentence.